1   JOHN T. JASNOCH (CA 281605)
    HAL D. CUNNINGHAM (CA 243048)
2   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
3   600 W. Broadway, Suite 3300
    San Diego, CA 92101
4   Telephone: (619) 233-4565
    jjasnoch@scott-scott.com
5   hcunningham@scott-scott.com

6   *Counsel for Plaintiff Mohan R. Sundaram*
    *and the Proposed Class*
7
    [Additional counsel on signature page.]
8

9                    **UNITED STATES DISTRICT COURT**
                   **NORTHERN DISTRICT OF CALIFORNIA**
10

11  MOHAN R. SUNDARAM, Individually and on      Case No. 3:22-cv-06750-CRB
    Behalf of All Others Similarly Situated,

12                         Plaintiff,

13         v.                                    **PLAINTIFF'S OPPOSITION TO**
                                                 **DEFENDANTS' MOTION TO DISMISS**
14  FRESHWORKS INC., RATHNA GIRISH
    MATHRUBOOTHAM, TYLER SLOAT,
15  ROXANNE S. AUSTIN, JOHANNA
    FLOWER, SAMEER GANDHI, RANDY
16  GOTTFRIED, ZACHARY NELSON, BARRY
    PADGETT, JENNIFER TAYLOR, MORGAN
17  STANLEY & CO. LLC, J.P. MORGAN
    SECURITIES LLC, BOFA SECURITIES,
18  INC., JEFFERIES LLC, BARCLAYS
    CAPITAL INC., ROBERT W. BAIRD & CO.
19  INCORPORATED, CANACCORD GENUITY
    LLC, JMP SECURITIES LLC, NEEDHAM &
20  COMPANY, LLC, NOMURA SECURITIES
    INTERNATIONAL, INC., OPPENHEIMER &
21  CO. INC., PIPER SANDLER & CO.,
    RAYMOND JAMES & ASSOCIATES, INC.,
22  AMERIVET SECURITIES, INC.,
    CASTLEOAK SECURITIES, L.P., SAMUEL
23  A. RAMIREZ & COMPANY, INC., and R.
    SEELAUS & CO., LLC,
24
                           Defendants.
25

26

27

28

---

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS – Case No. 3:22-cv-06750-CRB

1

## TABLE OF CONTENTS

2  STATEMENT OF ISSUES ........................................................................................................iii

3  SUMMARY OF ARGUMENT .................................................................................................iv

4  FACTUAL BACKGROUND ..................................................................................................... 1

5        A.   The Offering Documents Depict Rapidly Accelerating Growth ..............................1

6        B.   The Truth About Freshworks' Actual Condition as of the IPO Begins to
           Emerge ...................................................................................................................3

7  ARGUMENT .............................................................................................................................. 4

8      I.    PLAINTIFF ADEQUATELY PLEADS CLAIMS UNDER SECTION
9          11 OF THE SECURITIES ACT ............................................................................ 4

10       A.   Applicable Legal Standards ...................................................................................4

      B.   The Duty to Disclose .............................................................................................5

11       C.   The Offering Documents Materially Misled Investors as to Freshworks'
12          True Financial Condition, While Concealing Its Decaying Revenue and
         Calculated Billings Growth Rates .........................................................................6

13       D.   The Offering Documents "Risk Disclosures" Are Independently
14          Actionable as Materially Misleading Statements ..................................................10

15       E.   Plaintiff Also States Viable Claims Under Items 303 and 105 of SEC
         Regulation S-K.......................................................................................................12

16          (1)   Item 303 ...................................................................................................12

17          (2)   Item 105 ...................................................................................................14

18     II.    PLAINTIFF ADEQUATELY PLEADS CLAIMS UNDER
        SECTION 15................................................................................................................ 15

19 CONCLUSION............................................................................................................................ 15

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................5

5

6

*Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*,
    2008 WL 6742224 (N.D. Cal. Dec. 18, 2008) .............................................................4

7

8

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................................5

9

*Berson v. Applied Signal Tech., Inc.*,
    527 F. 3d 982 (9th Cir. 2008) ...................................................................................8, 11

10

11

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ........................................................................................5

12

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) ..............................................................11

13

14

*Franchi v. SmileDirectClub, Inc.*,
    No. 3:19-cv-00962, 2022 WL 4594575 (M.D. Tenn. Sep. 30, 2022)..........................7, 12, 13

15

16

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................................6

17

18

*Gerneth v. Chiasma, Inc.*,
    No. 16-cv-11082, 2018 WL 935418 (D. Mass. Feb. 15, 2018) ...............................14

19

*Golubowski v Robinhood Mkts*,
    2023 WL 1927616 (N.D. Cal. Feb 10, 2023) ..........................................................9, 13

20

21

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)......................................................................................................5

22

*Hildes v. Arthur Andersen LLP*,
    734 F.3d 854 (9th Cir. 2013) ........................................................................................5

23

24

*Huddleston v. Hermon & MacLean*,
    640 F.2d 534 (5th Cir. Unit A 1981), *rev'd in part on other grounds*, 459 U.S.
    375 (1983)....................................................................................................................10

25

26

*In re Alphabet*,
    1 F.4th 687 (9th Cir, 2021) ........................................................................................11

27

*In re Apple Inc. Sec. Litig.*,
    No. 19-CV-02033, 2020 WL 2857397 (N.D. Cal. June 2, 2020)................................6

28

ii

*In re CPI Card Group Inc. Sec. Litig.*,
    No. 16-cv-4531, 2017 WL 4941597 (S.D.N.Y. 2017) ............................................13

*In re Daou Sys., Inc.*,
    411 F.3d 1006 (9th Cir. 2005) .................................................................................5

*In re Eargo, Inc. Sec. Litig.*,
    No. 21-cv-08597, 2023 WL 1997918 (N.D. Cal. Feb 14, 2023) ...........................11

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 ....................................................................................7, 11, 14

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................................5

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ..........................................................................11

*In re Progenity Sec. Litig.*,
    No. 20-cv-01683, 2023 WL 219345 (S.D. Cal. Jan. 13, 2023) ..............................15

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y.1996) ............................................................................10

*In re Splunk Sec. Litig.*,
    592 F. Supp. 3d 919 (N.D. Cal. 2022) ...................................................................12

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ...................................................................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    480 F. Supp. 3d 1050 (N.D. Cal. 2020) ...............................................................v, 11

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994) .................................................................................10

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) .................................................................................11

*Livid Holdings Ltd v. Saloman Smith Barney, Inc*.,
    416 F.3d 940 (9th Cir. 2005) .................................................................................10

*Mauss v. Nuvavsive, Inc.*,
    No. 13-cv-2005, 2015 WL 10857519 (S.D. Cal. Aug. 28, 2015)......................10, 12

*Medina v. Tremor Video, Inc.*,
    640 Fed. App'x 45 (2d Cir. 2016)...........................................................................13

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999).......................................................................13

*Mingbo Cai v. Switch, Inc.*,
  No. 18-cv-01471, 2019 WL 3065591 (D. Nev. July 12, 2019) ...............................................14

*Moab Partners, L.P. v. Macquarie Infrastr. Corp.*,
  2022 WL 17815767 (2d Cir. Dec. 20, 2022) .................................................................................6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ....................................................................................................................5, 8

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)......................................................................................................8, 13

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
  2020 WL 5757628 (S.D.N.Y. Sept 27, 2020)...............................................................................15

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .......................................................................................................9

*Reidenger v. Zendisk, Inc.*,
  2020 WL 6562335 (N.D. Cal. Nov. 9, 2020) ...............................................................................15

*Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) .......................................................................................................6

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).........................................................................................................10

*Siracusano v. Matrixx Initiatives, Inc.*,
  563 U.S. 27 (2011) .........................................................................................................................5

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .....................................................................................................11

*South Ferry L.P. No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) .......................................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................................................4

*U.S. v. Smith*,
  155 F.3d 1051 (9th Cir. 1998) .......................................................................................................8

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ............................................................................................7

**Statutes, Rules, and Regulations**

17 C.F.R.
  §229.105...........................................................................................................................14
  §229.303(a)(3)(ii)...........................................................................................................12

Federal Rules of Civil Procedure

Rule 8 .................................................................................................................13
Rule 12(b)(6) ..............................................................................................4, 10, 14
Rule 15(a)(2) ......................................................................................................15

1

## STATEMENT OF ISSUES

2          1.      Whether the Consolidated Amended Complaint ("Complaint") adequately alleges

3   claims under Section 11 of the Securities Act of 1933 because the Offering Documents (a)

4   contained materially misleading statements, or (b) omitted material adverse information that was

5   required to be disclosed therein.

6          2.      Whether the Complaint adequately alleges "control person" claims under Section

7   15 of the Securities Act given the adequacy of Plaintiff's claims for primary violations of Section

8   11.[1]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   _____

28   [1]       Plaintiff does not dispute that he personally lacks standing to bring claims under Section
     12(a)(2) of the Securities Act, and accordingly does not oppose Defendants' motion to dismiss
     such claims as to him.  *Cf.* Defendants' Motion to Dismiss ("Def. Br."), ECF 72 at vi, 13-14.

1

## SUMMARY OF ARGUMENT

2       As with most young tech companies such as Freshworks, equity investors are especially

3  focused on such companies' growth rates, which typically hold the key to whether (and when)

4  such companies will start generating enough revenue to become profitable and justify the risk of

5  purchasing their common stock.  While investors understand that all investments involve risk, the

6  purpose of the federal securities laws is to ensure that a company's disclosures do not mislead

7  investors as to the **magnitude** of the relevant risks.  *See, e.g.*, *Affiliated Ute Citizens of Utah v.*

8  *U.S.*, 406 U.S. 128, 151 (1972) (federal securities laws "embrace a fundamental purpose . . . to

9  substitute a philosophy of full disclosure for the philosophy of **caveat emptor**").[2]  And these

10  disclosure obligations are particularly strong in the public offering context where Defendants are

11  not only under a duty to speak "fully and completely" on subjects that their statements have "put

12  in play," but where the SEC has imposed special affirmative disclosure rules requiring disclosure

13  of material "adverse events, trends or uncertainties."

14       Unfortunately for investors here, Defendants failed in their disclosure obligations here by

15  painting a picture of ongoing and **accelerating** growth.  And while the Offering Documents

16  "warned" investors of the "risk" that these trends **might** not continue in the future, these "risk

17  warnings" were themselves materially misleading as the Offering Documents failed to disclose

18  that, as of the September 21, 2021 IPO, Freshworks was **already** experiencing adverse financial

19  and operational trends in its 3Q 2021 (the quarter that had ended just seven business days after the

20  IPO) in the form of **deceleration** (rather than continued acceleration) in its rate of revenue and

21  calculated billings growth, as well as a **decline** (after five consecutive quarters of increases) in its

22  net dollar retention rate.  *See In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991),

23  *as amended on denial of reh'g* (Dec. 6, 1991) ("To warn that the untoward may occur when the

24  event is contingent is prudent; to caution that it is only possible for the unfavorable events to

25  happen when they have already occurred is deceit.").

26

27

28

---

[2]       Unless otherwise noted, all internal citations and quotations are omitted, and all emphases are added.

1    Defendants' various arguments for dismissal are unavailing.  *First*, citing non-binding

2    authorities, they assert that declines in operational performance must be "staggering" to require

3    disclosure before the end of a quarter – but, even assuming that such a standard applies, the

4    sequential declines in Freshworks' revenue growth (from 56% in 2Q 2021 to 46% in 3Q 2021 – a

5    decline of 18%) and calculated billings (from 61% to 41% – a decline of 33%) ***were*** calamitous.

6    Nor are Defendants correct that they are protected by some kind of rule that absolves them from

7    ever having to disclose intra-quarter results.

8    *Second*, Defendants cite this Court's prior decision in *In re Volkswagen "Clean Diesel"*

9    *Mktg., Sales Pracs., & Prods. Liab. Litig.*, 480 F. Supp. 3d 1050, 1061 (N.D. Cal. 2020) (Breyer,

10   J.) and other authorities to argue that Defendants were free to effectively mislead investors by

11   telling them only that it was "possible" for the unfavorable events to happen when they had already

12   occurred.  Plaintiff adequately alleges that this is indeed a case where Freshworks' risk disclosures

13   "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from

14   the one that actually exist[ed]."  *In re Eargo Sec. Litig.*, No. 21-cv-08597, 2023 WL 1997918, at

15   *12 (N.D. Cal. Feb 14, 2023) (Breyer, J.).  Moreover, while Defendants cite *Volkswagen* and other

16   cases to argue that misleading risk warnings statements are somehow not actionable, their cases

17   all predate the Ninth Circuit's controlling 2021 decision in *In re Alphabet Inc. Sec. Litig.*, 1 F.4th

18   687, 703-04 (9th Cir. 2021), which squarely held that statements that merely warn of "risks" that

19   "could" or "may" occur can indeed be actionably misleading if the risks had already materialized.

20   *Third*, Defendants argue that certain statements from the Offering Documents that

21   positively characterized Freshworks' historical performance are no more than "inactionable

22   corporate puffery."  Def.' Br. at viii.  But such statements, in context, remain relevant in assessing

23   Defendants' culpability in affirmatively creating an impression of a state of affairs that materially

24   differed from the one that actually existed.

25   *Fourth*, regardless of the "literal truth" of the Offering Documents reporting of historical

26   performance data, Defendants cannot escape their affirmative duty to disclose, under Item 303 of

27   SEC Regulation S-K (17 C.F.R §229.303), the material adverse events and trends that had already

28   materialized as of the IPO.  And at best, Defendants' arguments that they "did not know" that such

material adverse contingencies had materialized raises issues of disputed fact that are inappropriate for resolution under Rule 8 in this Securities Act case (which, unlike claims brought under the Exchange Act, are not subject to any heightened standards for pleading corporate awareness or knowledge).

*Fifth*, and for similar reasons as stated immediately above, the Offering Documents also violated Item 105 of Regulation S-K (17 C.F.R §229.105), by failing to warn investors of what was clearly one of the ***most*** material factors that "made an investment in the registrant [Freshworks] or the offering speculative or risky" (*id.*) – namely that Freshworks' growth rate was ***already*** sharply decelerating as of the date of the IPO.

*Sixth*, having stated actionable claims under Section 11, the Court should sustain Plaintiff's related "control person" claims under Section 15.

Accordingly, Defendants motion to dismiss Plaintiff's Section 11 and 15 claims should be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FACTUAL BACKGROUND

Freshworks is a "software as a service" ("SaaS") company that offers businesses cloud-based marketing, sales, support, and information technology ("IT") solutions.  ¶2.[3]  It divides its customers into three groups: (1) small businesses ("SMBs") with 250 or fewer employees; (2) Mid-Market Businesses, which employ 251 to 5,000 employees; and (3) large "Enterprise" businesses with over 5,000 employees.  ¶59.  As of the end of 2020, roughly 80% of Freshworks' customers were SMBs, 17% were Mid-Market Businesses; and 3% were Enterprises.  *Id.*

### A.    The Offering Documents Depict Rapidly Accelerating Growth

The Offering Documents portrayed Freshworks as experiencing growth that was not merely "rapid[]," but was ***accelerating***.  ¶61.  For example, as the Offering Documents stated:

> ***Our business has grown rapidly in recent periods as our customer base and operations have scaled***.  Our total revenue was $172.4 and $249.7 million in the years ended December 31, 2019 and 2020, respectively, representing a year-over-year growth rate of ***45%***.  [It] was $110.5 and $168.9 million in the six months ended June 30, 2020 and 2021, . . . representing a year on year growth rate of ***53%***.

*Id.* Similarly, at the quarterly level, they noted that Freshworks' revenue growth had steadily accelerated prior to the IPO from ***44%*** growth in 4Q 2020, to ***49%*** in 1Q 2021, to ***56%*** in 2Q 2021 (which ended June 30, 2021).  ¶62.  This trend is shown below (*see also* ¶7):



---

[3]        Unless otherwise defined herein, all terms are used pursuant to their respective definitions in the Complaint, and all citations to "¶" or "¶¶" refer to the Complaint, ECF 70.

The Offering Documents also portrayed Freshworks' "calculated billings" – a key non-GAAP metric that is the sum of Freshworks' recognized revenue and the change in its deferred revenue (¶65) – as experiencing accelerating growth.  ¶64.  As Plaintiff alleges, "calculated billings" is a particularly important non-GAAP metric for service-provider companies because it takes into account both GAAP revenue *and* the dollar value of new contracts signed (for which upfront cash has been received, but for which, under GAAP, revenue cannot yet be recognized because it has not yet performed all services due[4]), thereby providing a fuller picture of the company's revenue picture.  ¶4.  Indeed, as investors could readily determine from the Offering Documents, Freshworks' year-over-year "calculated billings" growth for the four consecutive quarters prior to the IPO had *accelerated* from *31%* (for the 3Q 2020) *to 47%, 53%, 54%, and ultimately 61%*, respectively, for the quarters ended September 30, 2020, December 31, 2020, March 31, 2021, and June 30, 2021.  ¶66.  This acceleration is shown below (*see also* ¶7):



The Offering Documents also referenced Freshworks' steadily improving annual recurring revenue ("ARR"), which it used in turn to calculate its net dollar retention rate.[5]  The Offering

---

[4]     GAAP provides that revenue may not be recognized until it is earned.  Thus, for example, if Freshworks receives $1200 from a customer on the first day of a new one-year contract, it will record that sum as a $1200 increase to its reported "deferred revenue" account on its balance sheet.  Thereafter, at the end of each quarter (as services are actually provided), a service provider such as Freshworks will reduce (debit) its deferred account by $300, as it converts a portion of what had been "deferred revenue" into "[recognized] revenue."  ¶4 at n.2.

[5]     To arrive at Freshworks' net dollar retention rate for a given period, one simply "divide[s] the Ending ARR by the Entering ARR."  *See* ¶74.

Documents described this rate as a "Key Business Metric," as it "measures . . . [Freshworks'] ability to increase revenue across our existing customer base through expansion of users and products associated with a customer as offset by our churn and contraction in the number of users and products associated with a customer." ¶73. In the four quarters leading up to IPO, Freshworks' net dollar retention rate rose from 107% (2Q 2020), to 109% (3Q 2020), to 111% (4Q 2020), to 112% (1Q 2020), and to 118% (2Q 2021) – another upward trend. ¶8, 67, 75.

### B.    The Truth About Freshworks' Actual Condition as of the IPO Begins to Emerge

After markets closed on November 2, 2021, Freshworks released its results for the quarter ended September 30, 2021 (the quarter that had closed *just seven business days* before the IPO. ¶10).

Amongst other highly disappointing news, Freshworks reported that it had generated only $96.6 million in revenue in the quarter – representing just 46% year-on-year ("yr-on-yr") growth compared to 56% yr-on-yr growth in the immediately preceding quarter, and a sudden and sharp reversal in Freshworks' prior accelerating revenue growth rate trend (from 44% in 4Q 2020, to 49% in 1Q 2021, to 56% in 2Q 2021) before its 3Q 2021 decline to 46%. *Id.* On the earnings call later that day, Defendant Sloat also disclosed that Freshworks' calculated billings for the quarter was only $109.3 million – representing just 41% yr-on-yr growth compared to 61% yr-on-yr growth rate in the prior quarter, and an equally distressing reversal in decline in Freshworks' prior accelerating billings growth rate (from 31% in 2Q 2020, to 47% in 3Q 2020, to 53% in 4Q 2020, to 54% in 1Q 2021, and 61% in 2Q 2021) before its 3Q2021 decline to just 41%. ¶80. In its press release, Freshworks also disclosed that as of the end of 3Q 2021, its net dollar retention rate had declined to 117% – the first time in over a year that this rate had declined (compared to prior steady increases from 107% in 2Q 2020, to 109% in 3Q 2020, to 111% in 4Q 2020, to 112% in 1Q 2021, and to 118% in 2Q 2021). ¶81. The next day, Freshworks shares plunged 14%. ¶82.

After markets closed on February 10, 2022, Freshworks issued a press release announcing its results for the fourth quarter ended December 31, 2021. ¶83. That release reported that Freshworks generated only $105.5 million in revenue, reflecting a further slowing in the Company's revenue growth rate in the fourth quarter to just 44% yr-on-yr growth (compared to

46% yr-on-yr in 3Q 2021).  ¶84.  The press release further reported that the Company's net dollar retention rate had declined again to just 114% (compared to 117% in 3Q 2021).  ¶85.  The disappointing revenue and net dollar retention rate news more than outweighed the fact that Freshworks' quarterly "calculated billings" growth had temporarily improved to 45% year-over-year (compared to 41% in 3Q 2021).  ¶86.  As a result, Freshworks' stock declined 18% following the disclosures of February 10, 2022, closing at just $18.41 per share on February 11, 2022.  *Id.*

After markets closed on May 3, 2022, Freshworks issued a press release announcing its financial results for the first quarter ended March 31, 2022.  ¶87.  The press release reported that Freshworks generated only $114.6 million in revenue, and revealed a further slowing of the Company's revenue growth rate in the first quarter to just 42% (compared to 44% in 4Q 2021, and 46% in 3Q 2021).  ¶88.  On the earnings call with analysts held later that day, Defendant Sloat disclosed that the Company's quarterly calculated billings growth rate had also fallen again, to just 32% yr-on-yr (compared to 45% in 4Q 2021, and 41% in 3Q 2021).  ¶89.  The negative news that Freshworks' revenue growth rate had now decelerated for three consecutive quarters, and that its calculated billings growth rate had fallen to its lowest level in nearly two years (since its 31% reported growth rate in 2Q 2020), significantly outweighed the news that the Company's net dollar retention rate had improved.  ¶90.  On May 5, 2022, Freshworks' common stock closed at $15.99 per share, reflecting a two-day decline of approximately 5.72% from its closing price of $16.96 on May 3 – and by the following Monday (May 9, 2022), Freshworks shares closed at a new low of just $14.07 – compared to the Company's IPO offering price of $36 per share.  ¶¶4, 91.

## ARGUMENT

## I.    PLAINTIFF ADEQUATELY PLEADS CLAIMS UNDER SECTION 11 OF THE SECURITIES ACT

### A.    Applicable Legal Standards

In assessing a motion to dismiss under Fed. Rule of Civ. Proc. 12(b)(6), courts must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  "A Rule 12(b)(6) analysis addresses the legal sufficiency of a claim, but does

1   not reach its merits." *Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, 2008 WL 6742224, at *2

2   (N.D. Cal. Dec. 18, 2008).  Accordingly, a complaint should not be dismissed if, when construed

3   in the light most favorable to plaintiff, it contains "sufficient factual matter, accepted as true, to

4   'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5   These rules apply with equal force to claims under the federal securities laws.  *In re LDK Solar*

6   *Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008).

7           Moreover, unlike fraud-based claims brought under the Exchange Act, claims brought

8   under Section 11 of the Securities Act (as here) "place[] a relatively minimal burden on a plaintiff."

9   *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (citing *Herman & MacLean v.*

10  *Huddleston*, 459 U.S. 375, 382 (1983).  A section 11 plaintiff need only show that the registration

11  statement contained a material omission or misrepresentation, "that is, it would have misled a

12  reasonable investor about the nature of his or her investment."  *In re Daou Sys., Inc.*, 411 F.3d

13  1006, 1027 (9th Cir. 2005) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir.

14  1996)); *see also Hildes*, 734 F.3d at 859 (plaintiff need only show material misstatement or

15  omission to establish *prima facie* §11 case; *In re Daou Sys.*, 411 F.3d at 1027 (under §11,

16  defendants may be liable even for innocent or negligent material misstatements or omissions).

17          "[W]hether a statement is 'misleading' depends on the perspective of a reasonable

18  investor."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175,

19  186 (2015).  As the parties agree, an omission is material when there is a substantial likelihood

20  that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

21  significantly altered the "total mix" of information made available.  *Basic, Inc. v. Levinson*, 485

22  U.S. 224, 231-32 (1988).  Moreover, on a motion to dismiss, "only if the adequacy of the disclosure

23  or the materiality of the statement is so obvious that reasonable minds could not differ are these

24  issues appropriately resolved as a matter of law."  *In re Stac Elecs.*, 89 F.3d at 1405 (citing *Fecht*

25  *v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

26          **B.    The Duty to Disclose**

27          Under the securities laws, a defendant has a duty to disclose when necessary "to make

28  statements made, in the light of the circumstances under which they were made, not [materially]

misleading." *Siracusano v. Matrixx Initiatives, Inc.*, 563 U.S. 27, 144 (2011) (ellipsis omitted). Similarly, even when there may be no independent duty to disclose information, once a company speaks on an issue or topic, it has a duty to speak sufficiently fully and completely so as to not mislead. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 179-80 (S.D.N.Y. 2010); *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) ("'[L]iteral truth is not the standard for determining whether statements . . . are misleading'. . . . Even if a statement is 'technically accurate,' a party may be obligated to disclose additional 'adverse information that cuts against the positive information' if it chooses to tout the positive data."); *Moab Partners, L.P. v. Macquarie Infrastr. Corp.*, 2022 WL 17815767, at *4 (2d Cir. Dec. 20, 2022) (having spoken about company's customer base, defendants had a duty to speak accurately and fully, giving all material facts on such issues to permit investors "to make a proper assessment of the alleged risks").

In addition, as discussed in section I.E(1) below, Item 303 of Regulation S-K imposes separate and independent affirmative obligations to disclose known trends, demands, events or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the Company.

## C. The Offering Documents Materially Misled Investors as to Freshworks' True Financial Condition, While Concealing Its Decaying Revenue and Calculated Billings Growth Rates

The Offering Documents' touting of how the company had "grown rapidly" in recent years (¶4) – combined with its publication of both (a) year-over-year data showing that its yr-on-yr revenue growth rate had increased to 56% as of the quarter ended June 30, 2021 (2Q 2021) (¶¶4, 62, 10) and (b) additional recognized revenue and deferred revenue data from which investors could determine that its calculated billings growth rate had increased to 61% as of the end of the 2Q 2021 – "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Retail Wholesale & Dep't Store Union Loc. 388 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017).  In short, by making such statements, "'they [were] obligated to speak truthfully and to make such additional disclosures as [were] necessary to avoid rendering the statements made misleading.'" *Freudenberg*, 712 F. Supp. 2d at 179-80; *In*

1    *re Apple Inc. Sec. Litig.*, No. 19-CV-02033, 2020 WL 2857397, at *11 (duty to disclose additional

2    "adverse information that cuts against the positive information" where defendant issues positive

3    data on the same subject); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487,

4    511 (discussion in "generalized and indefinite terms . . . fail[s] to constitute sufficient disclosure

5    where [the company] knew of the certainty of the trends" at the time of the IPO).

6            Having filed Offering Documents that showed a significant pre-IPO trend of accelerating

7    revenue growth and revealed information confirming even stronger acceleration in the Company's

8    calculated billings growth rate – two metrics that even Defendants apparently concede were

9    deemed highly material by both the Company and investors – Defendants, consistent with their

10   duty to speak with sufficient completeness so as to not mislead investors, were not free to omit

11   that Freshworks had experienced sharp declines in these growth rates as of the IPO's September

12   22, 2021 effective date.  *See Franchi v. SmileDirectClub, Inc.*, No. 3:19-cv-00962, 2022 WL

13   4594575, at *13 (M.D. Tenn. Sep. 30, 2022) (trends that had reversed in the quarter that was

14   ongoing at the time of the offering was data that "a reasonable investor would consider . . . to be

15   important to the overall picture such that the prospectus was 'materially incomplete' without the

16   quarter-in-progress data").

17           Defendants argue in response that Freshworks' "mere restatement" of historical results

18   cannot support a Securities Act claim (Def. Br. at 4-5) misses the point, because Plaintiff's

19   contention is that the prior data – and the accelerating growth trends it reflected – "provide[s] the

20   basis (context) for (rather than [itself] constitut[ing]) alleged misrepresentations."  *Franchi,* 2022

21   WL 4594575, at *12.  In other words, Defendants did more than simply restate "historical results"

22   that had no particular context; rather, they presented data that conveyed that Freshworks was riding

23   a ***then-current*** and ongoing period of accelerating growth while failing to disclose that this was in

24   fact no longer the case.

25           Defendants responded by citing various district court cases to the effect that "accurate

26   historical data does not become misleading even if less favorable results might be predictable."

27   *See* Def. Br. at 5, citing *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998).

28   However, this is not a case where a company simply missed its projections or turned in less

1    favorable results than might have been hoped for, but is instead a case where Defendants chose to

2    disclosed rosy historical trend data while *also* concealing that this highly positive trend data had

3    ***reversed***.  *See also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575

4    U.S. 175, 192 (2015) ("Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to

5    investors", such that defendants must "desist from misleading investors by saying one thing and

6    holding back another.").

7         Similarly, Defendants argue that they "had no duty to disclose intra-quarter results." (Def.

8    Br. at 5-6.) However, once again Plaintiff is not arguing that Freshworks had some abstract general

9    obligation to disclose the results of a quarter in progress, but rather that, in the context here of

10   Defendants' disclosures of affirmative trend data, Defendants put the subject of their revenue and

11   calculated billings growth "in play," thereby triggering their duty to speak with sufficient

12   completes on those subjects so as not to mislead.  *See, e.g.*, *Berson v. Applied Signal Tech., Inc.*,

13   527 F. 3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout the company's backlog, they

14   were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted

15   of.").  Indeed, as the Ninth Circuit stated in *U.S. v. Smith*, 155 F.3d 1051, 1065 (9th Cir. 1998),

16   "[We] have never held – nor even hinted – that . . . intra-quarter data cannot, as a matter of law,

17   be material. Nor has any other court for that matter, at least to the best of our knowledge." *See*

18   *also Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (finding

19   "little difficulty" in concluding that defendant failed to fully disclose the significance of adverse

20   developments that became known just in the three weeks before defendants' IPO).

21        Moreover, as even cases cited by Defendants hold, failure to disclose intra-quarter results

22   *is* actionable when such disclosure would have disclosed a highly significant, or "extreme"

23   deviation from past performance.  *See* Def. Br. at 6.  Here, Plaintiff alleges not some kind of

24   borderline 5% decline (a standard of materiality frequently cited by courts in assessing the

25   quantitative materiality of financial misstatements or omissions), but rather that Freshworks'

26   accelerating revenue growth rate (which had steadily increased on a yr-on-yr basis from 44% in

27   4Q 2020, to 49% in 1Q 2021, and to 56% in 2Q 2021) had declined to just 46% in the 3Q 2021 –

28   an 18% drop (-10% ÷ 56% = -17.85%).  ¶69.  The deterioration was even more stark with respect

1   to the reversal in the growth rate for Freshworks' key "calculated billings" metric.  There, after

2   growing year-on-year from 47% in 3Q 2020, to 53% in 4Q 2020, to 54% in 1Q 2021, and to 61%

3   in 2Q 2021 (¶70), the Company would reveal just six weeks after the IPO that it had plummeted

4   to just 41% in the 3Q 2021 – a nearly ***33% decline***.  *Id.*  Declines of such magnitude are plainly

5   more than "borderline material."  Accordingly, although various cases cited by Defendants have

6   expressed reluctance to impose liability on companies for failure to disclose intra-quarter financial

7   data, no such reluctance should apply here where the declines are as large as they are here.[6]

8          In response, Defendants (Def. Br. at 6) argue that the reported declines are unremarkable

9   because they were "generally in line" with Freshworks' historical growth.  If one were looking at

10  the performance of, *e.g.*, a mature oil company, Defendants' approach of looking at whether a

11  given metric fell within the "highs and lows" experienced in the last year or two might be

12  appropriate.  However, in the context of an emerging growth company, such as Freshworks, the

13  Court may reasonably infer that investors are far more focused on growth ***trends*** rather than how

14  the subject company is performing relative to its "average performance" (which would give equal

15  weight to data from a year or more ago).  In ***this*** context, the undisclosed declines were a clear

16  warning that the kind of growth rates which justified Freshworks' IPO price were ***already***

17  reversing (*see* charts, ¶7).

18         Defendants next argue that it is immune from liability because its financial results "were

19  accompanied by clear warnings that its recent growth rates m[ight] not be sustainable."  Def. Br at

20  7.  For example, Defendants cite the Offering Documents' statements that (1) "[e]ven if our

21  revenue continues to increase, we expect that our revenue growth rate ***may*** decline in the ***future,***"

22  (2) "our recent growth rates ***may*** not be indicative of our future growth"; and (3) "[o]ur quarterly

23  results of operations, including the levels of our revenue . . . may vary significantly in the future."

24  *Id.*  However, such warnings are quintessential boilerplate – all investors understand that there are

25  no guarantees of future performance – especially with respect to emerging growth companies – so

26  "warnings" that future performance "may" be worse is about as useful as a "warning" that a flipped

27

28  ───────────────

    [6]     To the extent that *Golubowski v Robinhood Mkts*, 2023 WL 1927616 (N.D. Cal. Feb 10,
    2023) found that declines of 19% and 35% in certain key metrics were not "extraordinary",
    Plaintiff respectfully submits that Judge Chen applied an overly demanding standard.

1    coin may come up "heads."  *Provenz v. Miller*, 102 F.3d 1478, 1493-4 (9th Cir. 1996) (warnings

2    that securities "involve a high degree of risk" are insufficient to ward against federal securities

3    fraud claims), citing *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994); *Livid*

4    *Holdings Ltd v. Saloman Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005) ("Dismissal on the

5    pleadings under the bespeaks caution doctrine . . . requires a stringent showing: There must be

6    sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree

7    that the challenged statements were not misleading.'").  Defendants also cite their "warning" that

8    Q3 2021 yr-on-yr results were "not necessarily" comparable to Q2 2021 yr-on-yr results because

9    "[t]he impact of the [COVID] pandemic on our results were more pronounced in the second quarter

10   of 2020." Def. Br. at 6.  But once again such "risk warnings" are simply not adequate, as a matter

11   of law and for purposes of a Rule 12(b)(6) motion, to insulate Defendants from liability for merely

12   warning that the Company's growth had ***already*** decelerated in the 3Q 2021 (*i.e.*, as of the IPO).

13        In sum, as in *Mauss v. Nuvavsive, Inc.*, No. 13-cv-2005, 2015 WL 10857519 (S.D. Cal.

14   Aug. 28, 2015), this Court should hold that:

15        . . . the court [is not] persuaded that Defendants' disclosures absolve them of
          liability, since Plaintiff claims that Defendants failed to disclose the true level of
16        risk, not that they failed to disclose that there was a risk.  ***Those are two very***
          ***different things***.  As other courts have put it: "The doctrine of bespeaks caution
17        provides no protection to someone who warns his hiking companion to walk slowly
          because there might be a ditch ahead when he knows with near certainty that the
18        Grand Canyon lies one foot away."  *In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
          930 F. Supp. 68, 72 (S.D.N.Y.1996).
19

20   2015 WL 10857519, at *15.  *See also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)

21   ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the

22   risk has transpired.").   Indeed, as discussed in the next section, Defendants' purportedly

23   "cautionary warnings" were themselves actionably misleading statements.

24        **D.    The Offering Documents "Risk Disclosures" Are Independently Actionable as**
               **Materially Misleading Statements**

25

26        As the Fifth Circuit eloquently put it over 40 years ago, "to warn that the untoward may

27   occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable

28   events to happen when they have already occurred is ***deceit***."  *Huddleston v. Hermon & MacLean*,

1   640 F.2d 534, 544 (5th Cir. Unit A 1981), *rev'd in part on other grounds*, 459 U.S. 375 (1983).

2   Since then, courts across the country have similarly held that it is misleading for a defendant to

3   characterize a contingency as a mere risk when the purported "risk" has already transpired.

4   *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (10-Q that warned of

5   "risks of product liability claims in the abstract" was misleading for failing to disclose that the risk

6   had already come to fruition); *Berson*, 527 F.3d at 986 (misleading to warn of "as-yet-unrealized

7   risks and contingencies" where "some of these risks may already have come to fruition"); *Flynn

8   v. Sientra, Inc.*, 2016 WL 3360676, *11 (C.D. Cal. June 9, 2016) (disclosure of "risk" that Sientra's

9   "products may not be manufactured in accordance with agreed upon specifications" or that "its

10  manufacturing facilities may not be able to maintain compliance with regulatory requirements"

11  were "more than plausibly misleading [given] Plaintiffs' allegations that serious regulatory issues

12  had already transpired by the time these statements were made"); *In re MobileMedia Sec. Litig.*,

13  28 F. Supp. 2d 901, 930 (D.N.J. 1998) ("Were . . . Plaintiffs able to prove [their factual] allegations

14  . . . the statements defendants argue are cautionary statements would themselves be misleading.").

15  *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d at 516 (same & collecting cases).

16      Simply stated, this case is a textbook example of Offering Documents that misleadingly

17  warned of a general risk that corporate performance in the future **may** deteriorate, when in fact that

18  supposed "contingency" had (as Defendants do not even seriously dispute) **already** materialized.

19      Defendants, citing this Court's 2020 decision in *In re Volkswagen* (among other cases),

20  contend that there is an unresolved split in authority on the "viability" of Plaintiff's theory in this

21  Circuit.  Def. Br. at 9.  However, any doubt on this score has plainly been erased by *In re Alphabet*,

22  1 F.4th 687 (9th Cir, 2021), where the Ninth Circuit squarely held that purported risk disclosures

23  that "speak[] entirely of as-yet-unrealized risks and contingencies" and do not "alert the reader that

24  some of these risks may already have come to fruition" may indeed mislead reasonable investors.

25  *Id.* at 703-04, citing *Berson*, 527 F.3d at 985–87, and *Khoja v. Orexigen Therapeutics, Inc.*, 899

26  F.3d 988, 1015–16 (9th Cir. 2018).

27      As a fallback, Defendants argue that Plaintiff still needs to adequately allege that (1) the

28  "risk" that the Company "might" suffer declining revenue and calculated billings growth rates had

1    "come to fruition" as of the date of the IPO, and (2) that the risk disclosures "created an impression

2    of a state of affairs that differed in a material way from the one that actually existed."  Def. Br. at

3    9, citing *In re Eargo, Inc. Sec. Litig.*, 2023 WL 1997918, at *12.  Defendants do not appear to

4    contest the first prong, but instead argue that Plaintiff fails the second prong because the Complaint

5    itself "confirms" that Freshworks' reported Q3 2021 growth rates "largely tracked" its recent

6    historical numbers. *Id.*  However, as discussed above, Freshworks' revenue and calculated billings

7    growth rates were plainly ***not*** "tracking" their recent historical experience in the 3Q 2021 because

8    instead of tracking ***up***, they were now tracking ***down***.  In essence, Defendants are asking the Court

9    to decide as a matter of law that no reasonable investor would have found it material to know that

10   such declines were ***already ongoing***, as opposed to merely a possibility.  There is no basis for such

11   a finding here.  *See, e.g.*, *Franchi*, 2022 WL 4594575, at *13 (fact that trends in three financial

12   metrics had reversed in the quarter ongoing at the time of the offering was data "a reasonable

13   investor would consider . . . to be important to the overall picture"); *Mauss*, 2015 WL 10857519,

14   at *15 (disclosing a risk – and disclosing the ***true level*** of risk – "are two very different things");

15   *In re Splunk Sec. Litig.*, 592 F. Supp. 3d 919, 941 (N.D. Cal. 2022) ("like materiality, adequacy of

16   disclosure is normally a jury question").

17           In sum, far from immunizing Defendants from liability, the Offering Documents supposed

18   "risk disclosures" are adequately alleged to be independently actionable misstatements.[7]

19           **E.      Plaintiff Also States Viable Claims Under Items 303 and 105 of SEC
                       Regulation S-K**

20

21           (1)     **Item 303**.  Item 303 of Regulation S-K imposes an independent and affirmative

22   duty to disclose "any known trends or uncertainties that have had or that the [registrant] reasonably

23   expects will have a material favorable or unfavorable impact on net sales or revenues or income

24   from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).  The SEC's guidance regarding Item

25   303, *see* SEC Releases No. 6835, 1989 WL 1092885 (May 18, 1989) (the "1989 Release") and

26   _____

27   [7]      Defendants also argue that certain statements from the Offering Documents that positively
     characterized Freshwork's historical performance are inactionable, either because they are literally
     true (company has "grown rapidly") or constitute mere "puffery."  Def. Br. at viii, 10.  Plaintiff
28   does not dispute that such statements are not independently actionable, but note that, in context,
     they contributed to the Offering Documents' creation of an impression of a state of affairs that
     materially differed from the one that actually existed.

No. 8350, 2003 WL 22996757 (Dec. 19, 2003) (the "2003 Release"), both reiterate the vital role

that the management discussion and analysis ("MD&A") section of SEC filings is intended to play

in "giv[ing] the investor an opportunity to look at the company through the eyes of management

by providing both a short and long-term analysis of the business of the company.  1989 Release at

*3; *accord* 2003 Release at *2.  Thus, if management determines that a "known trend, demand,

commitment, event or uncertainty" is ***not*** likely to come to fruition, no independent disclosure

obligation is triggered – but absent such a determination, disclosure of the "known trend, demand,

commitment, event or uncertainty" is ***required*** (unless management determines that a material

effect on the company's financial condition or results is not reasonably likely to occur).  1989

Release at *6.  Moreover, because Item 303 claims are brought under §11, claims alleging

nondisclosure of such adverse trends, events or uncertainties are governed by the basic notice

pleading rules of Fed. R. Civ. Proc. 8.  *Panther Partners*, 681 F.3d at 120-22.[8]

Defendants, while not contesting the accuracy of the graphs cited above and at ¶7, argue

that at the time of the IPO Freshworks "had seen lower growth (if at all) for two months at most,"

and that this is simply insufficient as a matter of law to constitute a "persistent" trend under Item

303.  Def. Br at 11, citing *Robinhood*, 2023 WL 1927616, at *8 and a number of out-of-circuit

cases.  However, Plaintiff respectfully submit the better reasoned caselaw holds that sharp (but

undisclosed) declines manifested within the same quarter as an IPO are accorded no magic

immunity under Item 303.  *See, e.g.*, *Franchi*, 2022 WL 4594575, at *9 (allegations of "sudden

downward trend[s]" in three financial metrics in quarter in which IPO occurred were sufficient to

---

[8]      *See also, e.g.*, *Medina v. Tremor Video, Inc.*, 640 Fed. App'x 45, 48 (2d Cir. 2016)
(requiring only "facts from which we [can] draw the 'plausible inference' that defendants had
actual knowledge of the trends or uncertainties [as of] the registration statement"); *see also In re
CPI Card Group Inc. Sec. Litig.*, No. 16-cv-4531, 2017 WL 4941597, at *4 (S.D.N.Y. 2017).
Thus, even in cases (unlike here) that allege fraud under §10b under the Exchange Act of 1934
which are subject to a significantly higher "strong inference of scienter" pleading standard, it
would be reasonable to infer that Freshworks management were well aware of the state of the
Company's revenue and calculated billings growth as of the date of the IPO as these were arguably
the Company's two single most important performance metrics.  *See, e.g.*, *South Ferry L.P. No. 2
v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008) (even demanding PSLRA standard is met where "it
would be absurd to suggest that management was without knowledge of the matter").  *A fortiori*,
given that no heightened pleading standards applies, it may be plausibly inferred that Freshworks
management was aware as of the IPO that (*inter alia*) these metrics had already deteriorated – and
we note that even Defendants do not appear to argue to the contrary.

1  plead a material omission under Item 303); *Facebook*, 986 F. Supp. 2d at 512 (finding duty to

2  disclose under Item 303 material negative impact to revenue evident in internal projections

3  prepared ten days before offering); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231

4  (S.D.N.Y. 1999) (Item 303 required disclosure of known declining sales trend that occurred in the

5  same quarter as the offering.).

6          Alternatively, Defendants allege that the Complaint insufficiently alleges that, as of the

7  IPO, lower growth was "reasonably likely to continue" or that "any Defendant knew it."  Def. Br.

8  at 12.  Here, however, language that the Defendants themselves used in the Offering Documents

9  is worth noting.  Specifically, the Offering Documents' "warned" that, although Freshworks had

10 recently experienced rapid growth, "we expect that our revenue growth may decline in the future

11 as a result of a variety of factors."  *See* Def. Br. at 7.  This language can and should be plausibly

12 construed as reflecting the Defendants' own belief that it expected its accelerating growth rates to

13 "top out" – and that thereafter management ***expected*** the Company's growth rates would to then

14 start a ***persistent*** downward decline "as a result of a variety of factors."  *Id.*[9]  Of course,

15 Defendants' brief cites this same language to argue that it adequately warned of the risk that

16 Freshworks would hit precisely such an inflection point – but, as discussed at §§I.C & D above,

17 such "warnings" were ineffectual, and were indeed independently actionable as misleading

18 statements.

19          **(2)     Item 105**

20          Item 105 of Reg. S-K requires disclosure of "the material factors that make an investment

21 in the registrant or offering speculative or risky."  17 C.F.R. §229.105.  Accordingly, it is hardly

22 surprising that an issuer also violates Item 105 when its risk disclosures present risks as contingent

23 when they have already come to fruition.  *See Gerneth v. Chiasma, Inc.*, No. 16-cv-11082, 2018

24 WL 935418, at *4-5 (D. Mass. Feb. 15, 2018) (plaintiffs adequately alleged Item 503 [now Item

25 105] violation because risk warnings concerning possible FDA rejection of new drug application

26

27 _____

28  [9]     That this is precisely what actually happened (*see* ¶7) is meaningful ***corroboration*** of the
   Complaint's allegations regarding actionably undisclosed adverse trends – allegations that as noted
   above are otherwise supported by drawing reasonable inferences from the Offering Documents in
   Plaintiff's favor, as required on this Rule 12(b)(6) motion.

in offering documents failed to disclose that "the FDA had already stated its disagreement with the Phase 3 trial design" by the time of the offering.); *see also Mingbo Cai v. Switch, Inc.*, No. 18-cv-01471, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (item 105 requires specific disclosure of risks to company's revenue).

Here, as in *Gerneth* and *Mingbo*, although the Offering Documents contained pages upon pages of contingent risk warnings (including that the company *might* experience deterioration in its revenue growth and other important growth metrics), *this "risk" had in fact already materialized*. Thus, for the same reasons discussed at §§I.C-E(1) above, the Offering Documents violated Item 105. *See also Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *7 (S.D.N.Y. Sept 27, 2020) ("the [Item 105] inquiry can be boiled down to whether the Offering Documents were accurate and sufficiently candid").

For their part, Defendants simply cite cases, such as *In re Progenity Sec. Litig.*, No. 20-cv-01683, 2023 WL 219345 (S.D. Cal. Jan. 13, 2023), where courts dismissed §15 claims because of insufficient allegations from which one could plausibly infer that Defendants were aware of the omitted risk. As previously discussed, however, Plaintiff here adequately alleges that Freshworks and its management knew as the September 21 IPO of the performance declines at issue.

## II.   PLAINTIFF ADEQUATELY PLEADS CLAIMS UNDER SECTION 15

Defendants' only argument for dismissal of Plaintiff's §15 claim is the purported failure to state a viable underlying §11 claim. Def. Br. at 14. A valid underlying claim having been stated, however, the §15 claim should also be sustained.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be dismissed.[10]

DATED:  July 31, 2023                                SCOTT+SCOTT ATTORNEYS AT LAW LLP
                                                    */s/ John T. Jasnoch*
                                                    John T. Jasnoch (CA 281605)
                                                    Hal D. Cunningham (CA 243048)
                                                    600 W. Broadway, Suite 3300

---

[10]      Should the Court grant Defendants' Motions, in whole or part, Plaintiff respectfully requests leave to amend under Fed. R. Civ. P. 15(a)(2). *See Reidenger v. Zendisk, Inc.*, 2020 WL 6562335, at *12 (N.D. Cal. Nov. 9, 2020).

San Diego, CA 92101
Telephone: (619) 233-4565
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
William C. Fredericks (*pro hac vice*)
Thomas L. Laughlin, IV (*pro hac vice*)
Mandeep S. Minhas (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 233-6444
wfredericks@scott-scott.com
tlaughlin@scott-scott.com
mminhas@scott-scott.com

**THE SCHALL LAW FIRM**
Brian J. Schall
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: (310) 301-3335
Facsimile:  (310) 388-0192
brian@schallfirm.com

*Counsel for Lead Plaintiff Mohan R. Sundaram and the Proposed Class*

1

### <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on July 31, 2023, I caused the foregoing document to be filed with the

3

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

4

email addresses denoted on the Electronic Mail Notice List.

5

Executed on July 31, 2023, at San Diego, California.

6

7

                    */s/ John T. Jasnoch*
                    John T. Jasnoch (CA 281605)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17