IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAN R. SUNDARAM, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>FRESHWORKS INC, et al.,<br><br>    Defendants. | Case No. 22-cv-06750-CRB<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

Lead Plaintiff Mohan Sundaram has sued Freshworks Inc. and its executives, directors, and IPO underwriters for violations of Sections 11 and 15 of the Securities Act of 1933. Defendants move for summary judgment on the basis that they have shown that any recoverable losses in Freshworks's stock price were not caused by Defendants' alleged omissions leading up to Freshworks's initial public offering. The Court agrees: the uncontested evidence in the record establishes that no omission by Defendants caused Freshworks's stock price to drop below the IPO price, and the law is clear that Sundaram cannot recover for drops above the IPO price. Finding this matter suitable for resolution without argument pursuant to Civil Local Rule 7-1(b), the Court vacates the hearing scheduled for April 11, 2025 and **GRANTS** Defendants' motion for summary judgment.[1]

**I.   BACKGROUND**

    **A.   Factual Background**

Freshworks, a software company, went public on September 22, 2021 at a stock price of $36.00 per share. Am. Compl. (dkt. 70) ¶¶ 18, 58. Sundaram purchased 1,000

---

[1] This ruling means that Sundaram's motion for class certification (dkt. 122), is moot. The Court therefore vacates the hearing on that motion scheduled for July 18, 2025.

shares of Freshworks's common stock the next day at a price of $46.00 per share. Sundaram Decl. (dkt. 122-1) ¶ 5.

Freshworks's filings at the time it went public included the company's strong Q2 2021 numbers but not its weaker interim Q3 2021 numbers. Am. Compl. ¶¶ 4–5, 61–63, 66–67, 78–82. Freshworks released its Q3 2021 numbers after markets closed on November 2, 2021. Id. ¶¶ 78–82. Before markets opened the next day, more than a dozen securities analysts had published reports on Freshworks's weaker Q3 2021 numbers. See Grenadier Rpt. (dkt. 116-5) ¶¶ 31, 41. On November 3 Freshworks stock dropped 14%, from $50.07 per share to $43.06 per share, and the following day it dropped another 8% to $39.59 per share. Freshworks Stock Price Data (dkt. 116-3). After this initial drop, Freshworks stock hovered around $40 per share (plus or minus a few dollars) for several weeks. See id. It dropped below $36.00 per share—the stock's IPO price—for the first time on November 15, 2021. Id. Sundaram sold all 1,000 of his shares for $14.99 per share on January 13, 2023. Sundaram Decl. ¶ 5.

### B. Procedural History

Sundaram filed this lawsuit in November 2022, asserting (among other causes of action that have since been dismissed) that Defendants violated Item 303 of SEC Regulation S-K. Am. Compl. ¶ 93. Item 303 requires companies going public to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303. Specifically, Defendants' failure to disclose Freshworks's weaker Q3 2021 numbers is the omission that Sundaram argues gives rise to an Item 303 violation. Am. Compl. ¶¶ 93–34.[2]

---

[2] Though Sundaram incorporates allegations of Defendants' conduct spanning through May 2022 in his description of Defendants' supposed Item 303 violation, it is clear from the amended complaint that any such violation must be predicated on information that the Defendants knew "[a]s of the IPO and the issuance of the Offering Documents." Am. Compl. ¶ 94. The Offering Documents were declared "effective" by the SEC on September 21, and Freshworks went public the next day. Id. ¶¶ 18, 60. Sundaram contends only that Defendants knew their Q3 2021 numbers at that time, not that they knew any subsequent metrics, such as their Q4 2021 or Q1 2022 numbers.

2

1    Defendants filed a Rule 12(b)(6) motion to dismiss in June 2023, which the Court
2    denied as to Sundaram's Item 303 claim and otherwise granted. MTD Order (dkt. 81) at
3    13–15, available at 2023 WL 6390622. Defendants then filed a Rule 12(c) motion for
4    judgment on the pleadings in July 2024, which the Court denied. MJP Order (dkt. 103),
5    available at 2024 WL 4369349. Defendants now move for summary judgment.

## II.    LEGAL STANDARD

Summary judgment is proper when there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine dispute of material fact. Celotext Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). If the nonmoving party fails to do so, "the moving party is entitled to a judgment as a matter of law." Celotex, 477 U.S. at 323.

## III.   DISCUSSION

Defendants' argument for summary judgment proceeds in two steps. First, they assert that, under the language of the statute, Sundaram cannot recover for losses sustained above the IPO price of $36 per share. Second, they contend that analysis done by their expert, Dr. Steven Grenadier, demonstrates that any losses in Freshworks's stock value below that $36 threshold were not caused by the alleged omissions leading up to the IPO. Thus, Defendants say, the losses traceable to their alleged omissions are not recoverable, and any losses that might be recoverable are not traceable to their alleged omissions. Defendants are correct on both counts, so summary judgment is appropriate.

3

**A.   Recoverable Losses**

The first piece of Defendants' argument is that section 11 of the Securities Act does not permit plaintiffs to recover for stock price declines above the offering price. The Court held as much in its order on Defendants' motion for judgment on the pleadings, see MJP Order at 3, and that remains the law.

Sundaram spends significant space in his opposition brief arguing that the Court's prior order was wrong, or ambiguous, or dicta—and that in any case Defendants misconstrued the order. Opp. (dkt. 124) at 12–15. But the Court's order was clear: "[Section] 11(e) of the Securities Act does not permit plaintiffs to recover for stock price declines above the IPO price." MJP Order at 3. The statute is clear too:

> [A] suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security <u>(not exceeding the price at which the security was offered to the public)</u> and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security <u>(not exceeding the price at which the security was offered to the public)</u> and the value thereof as of the time such suit was brought.

15 U.S.C. § 77k(e) (emphasis added). As is the case law. See Plichta v. SunPower Corp., 790 F. Supp. 2d 1012, 1023 (N.D. Cal. 2011) ("The sole plaintiff that purchased debentures has certified it sold those securities at a price in excess of the offering price. … Plaintiffs' arguments … cannot survive the impact of the statutory definition of recoverable damages in this context."); In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 348 (S.D.N.Y. 2003) ("an investor who bought above the offering price must nonetheless use the offering price as the starting point for damages calculations"); In re WRT Energy Sec. Litig., 2005 WL 2088406, at *3 (S.D.N.Y. Aug. 30, 2005) ("If any plaintiffs purchased their securities above the offering price, those plaintiffs cannot recover for the difference between the purchase price and the offering price.").

Perhaps Sundaram takes issue with the Court's use of "IPO price" instead of

4

"offering price" in its prior order. To the extent that the precise verbiage caused confusion, it should not have. Sundaram alleges that Defendants omitted material information in support of Freshworks's IPO, making that the relevant "offering." And Sundaram does not allege that there was a follow-on stock offering. There is thus no difference between the terms "IPO price" and "offering price" for purposes of this case.

In any case, Sundaram appears to concede the point when he acknowledges that his statutory damages must be taken out of the $36 per share IPO price, not the $46 per share price he actually paid. See Opp. at 10 ("[I]n Plainiff's case, § 11(e)'s loss limitation rule—which limits 'X' to the lower of (i) the 'amount paid for the security' ($46.00) or (ii) 'the price at which the security was offered to the public' ($36.00)—applies, so that 'X' in all scenarios is, indisputably, the lower of these two numbers, i.e., $36.00 per share (the IPO price)." (emphasis in original)). Under this mathematical framework, Sundaram would not recover for any losses above the IPO price, exactly as the Court said in its prior order.

The Court thus reiterates that under section 11 of the Securities Act, Sundaram can recover only for losses he sustained by Freshworks stock dropping below the IPO price of $36 per share. That prompts the next question—whether Defendants' alleged omissions caused any such drop.

### B.     Causation

The Securities Act permits securities defendants to raise an affirmative defense of negative causation, which requires the defendants to prove that "any portion or all of [the plaintiff's] damages represents other than the depreciation in value of [a] security resulting from … the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(e). The burden of proof rests on securities defendants to prove that any recoverable loss was not caused by their alleged omissions. See Hildes v. Arthur Andersen LLP, 734 F.3d 854, 860 (9th Cir. 2013).

Defendants pursue this defense, meaning they aim to establish that their November 2, 2021 release of Freshworks's Q3 2021 numbers did not cause any recoverable losses.

5

See Mot. (dkt. 115) at 7–14.  Defendants contend, relying heavily on the expert report of economist Steven Grenadier, that Freshworks stock traded in an efficient market, meaning that the market absorbed any impact from the release of the Q3 2021 numbers before the stock price first dropped below $36 per share on November 15.  This is a viable method of establishing negative causation:

> The damages of a purchaser were always understood to be the difference between the purchase price and the true value of the shares (adjusted for any negative causation) as disclosed after the revelation of the fraud to the public, followed by a reasonable period (usually no longer than a week or ten days) during which the market took cognizance of the fraud and the publicly traded price was presumed, under the 'efficient market' hypothesis endorsed by the Supreme Court in Basic, to reflect an adjustment for the fraud.

In re Oxford Health Plans, Inc. Sec. Litig., 244 F. Supp. 2d 247, 250 (S.D.N.Y. 2003).[3]

    The efficient market hypothesis presumes that all publicly available information is reflected in the stock price.  If a market is efficient, courts presume that any publicly released information affects the stock price within minutes or hours—or, at most, within a day.  See, e.g., In re Finisar Corp. Sec. Litig., No. 11-cv-1252-EJD, 2017 WL 3023244, at *7 (N.D. Cal. Dec. 5, 2017); In re Intuitive Surgical Sec. Litig., No. 13-cv-1920-EJD, 2016 WL 7425926, at *14 (N.D. Cal. Dec. 22, 2016); In re Initial Pub. Offering Sec. Litig., 260 F.R.D. 81, 102 (S.D.N.Y. 2009).

    In determining whether a market is efficient, courts within the Ninth Circuit weigh the five factors outlined in Cammer v. Bloom and the three factors described in Krogman v. Sterritt.  In re FibroGen Sec. Litig., 2024 WL 1064665, at *8, 11 (N.D. Cal. Mar. 11, 2024).  The Cammer factors are (1) whether the stock trades at a high average weekly volume, (2) whether securities analysts follow and report on the stock, (3) whether the stock has "market makers," (4) whether the company meets the minimum stock requirements to file SEC registration form S-3, and (5) whether there are "empirical facts

---

[3] Though Oxford Health Plans was not a section 11 case, the same framework applies here. See Yedlowski v. Roka Bioscience, Inc., No. 14-cv-8020-FLW, 2016 WL 6661336, at *15 (D.N.J. Nov. 10, 2016) ("In applying this negative causation defense, courts limit recovery to the drop in stock price immediately following a corrective disclosure.").

6

showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." Cammer v. Bloom, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989). The Krogman factors look to (6) "the capitalization of the company," (7) "the bid-ask spread of the stock," and (8) "the percentage of stock not held by insiders." Krogman v. Sterritt, 202 F.R.D. 467, 474 (N.D. Tex. 2001).

Sundaram does not expressly contend that any of the Cammer or Krogman factors support Defendants' argument that Freshworks stock traded in an efficient market, so the Court discusses the factors only briefly:

- **Trading Volume.** Freshworks stock had an average weekly trading volume of about 22.7% shares outstanding, Grenadier Rpt. ¶ 30, which exceeds the 1%–2% Cammer threshold. See FibroGen, 2024 WL 1064665, at *9.
- **Securities Analysts.** Freshworks stock was covered by 13 securities analysts, who published 13 analyst reports before markets opened on November 3, 2021 highlighting Freshworks's weaker Q3 2021 numbers. Grenadier Rpt. ¶¶ 29–30. Courts regularly hold that coverage from five to eight analysts supports market efficiency. See, e.g., FibroGen, 2024 WL 1064665, at *9 (eight analysts).
- **Market Makers.**[4] Freshworks had 39 market makers in early November 2021, Grenadier Rpt. ¶ 29 n.49, which creates a substantial presumption of market efficiency. See, e.g., Cammer, 711 F. Supp. at 1293 (ten market makers).
- **SEC S-3 Form.** Freshworks was eligible to file a Form S-3 as of November 3, 2021, Grenadier Rpt. ¶ 30 n.53, which favors market efficiency. See, e.g., Malriat v. QuantumScape, No. 21-cv-58-WHO, 2022 WL 17974629, at *10 (N.D. Cal. Dec. 19, 2022).
- **Cause-and-Effect Relationship.** Plaintiff admits "a cause-and-effect relationship between the public disclosure of Freshworks'[s] financial release on

---

[4] A market maker "is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." FibroGen, 2024 WL 1064665, at *9 (citation omitted).

7

November 2, 2021 and the change in Freshworks'[s] Stock price on November 3, 2021." Resp. to ROAs (dkt. 116-4) at 21. Dr. Grenadier's event study analysis also supports this finding. See Grenadier Rpt. ¶¶ 36–43.

- **Market Capitalization.** Freshworks's market capitalization was $2.2 billion on November 3, 2021, Resp. to ROAs at 23–24, which favors market efficiency. See, e.g., Junge v. Geron Corp., No. C 20-547-WHA, 2022 WL 1002446, at *4 (N.D. Cal. Apr. 2, 2022) (market capitalization of around $1 billion).

- **Bid-Ask Spread.** Freshworks's bid-ask spread hovered between 0.05% and 0.31% in early November 2021, Grenadier Rpt. ¶ 30, which supports market efficiency. See, e.g., Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563, 574 (C.D. Cal. 2012) (0.58% bid-ask spread).[5]

- **Public vs. Insider Holdings.** Freshworks's "public float" (the measure of the percentage of shares held by the public rather than insiders) was over 95% in early November 2021, Resp. to ROAs at 34, which weighs in favor of market efficiency. See, e.g., FibroGen, 2024 WL 1064665, at *11 (91% public float).

In short, all eight of the Cammer / Krogman factors support a finding of market efficiency.

Rather than contesting these factors, Sundaram argues (1) that something called "post-earnings announcement drift" may have occurred in the weeks following the November 2, 2021 release, (2) that Defendants failed to disaggregate the November 2–4 period from the period following November 5, and (3) that Defendants failed to affirmatively identify what caused Freshworks stock to drop below $36 per share. Opp. at 16–19. None of these arguments establish a genuine dispute of material fact.

### 1. Post-Earnings Announcement Drift

Sundaram relies on the expert report of Dr. Zahn Bozanic, an accountant who he retained to respond to Dr. Grenadier's expert analysis, to assert that stock prices may drift downwards for up to three months after negative earnings surprises become public.

---

[5] A narrower bid-ask spread is more indicative of market efficiency. FibroGen, 2024 WL 1064665, at *11.

8

Bozanic Rpt. (dkt. 124-5) ¶¶ 3, 17–24. The theory of post-earnings announcement drift is supported in the academic literature, as Dr. Bozanic explains.[6] But Dr. Bozanic never applies the theory to the facts of this case: he does not explain how any characteristic of Freshworks's stock or any evidence from how that stock was traded after November 2, 2021 supports a finding that drift occurred. He simply opines, without any case-specific analysis, that the mere potential for drift undermines Dr. Grenadier's conclusions that the market responded to Freshworks's Q3 2021 numbers well before the stock price first dropped below $36 per share on November 15, 2021. Id. ¶¶ 25, 29; Bozanic Sur-Reply Rpt. (dkt. 131-1) ¶ 11. That is too speculative to create a genuine dispute of material fact. See Alpha Cap. Anstalt v. Intellipharmaceutics Int'l Inc., No. 19cv9270 (DLC), 2021 WL 2896040, at *6 (S.D.N.Y. July 9, 2021) (no dispute of material fact created by plaintiff's expert, who did not conduct an event study but merely attacked defendant's expert's conclusions in a speculative and conclusory fashion).[7]

### 2. Disaggregation

Sundaram next makes the related argument that Defendants failed to disaggregate the November 2–4 period from the post–November 5 period, which (he claims) means that they failed to establish negative causation. To be sure, if there is evidence that any portion of a plaintiff's recoverable losses was caused by the alleged omission, then summary judgment is inappropriate. See Fed. Hous. Fin. Agency ex rel. Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., 873 F.3d 85, 153 (2d Cir. 2017). But Defendants have shown, and Sundaram has not rebutted, that the market fully absorbed the Q3 2021 earnings statement

---

[6] Although there is academic literature on the post-earnings announcement drift theory dating back to at least 1989, see Bozanic Rpt. ¶ 19, the theory has found less purchase among courts. The Court is aware of only one case even mentioning the theory, Tatum v. R.J. Reynolds Tobacco Co., and that discussion was irrelevant to the issues before the Court. No. 02CV373, 2016 WL 660902, at *18–19 (M.D.N.C. Feb. 18, 2016). The Court is unaware of any case in which the theory, with or without case-specific analysis, was found to create a genuine dispute of material fact as to market efficiency.

[7] In any case, there is no apparent evidence of post-earnings announcement drift in the record. To the contrary, the record is clear that Freshworks stock significantly declined in value between November 2 and November 4, 2021, but then leveled off at around $40 per share for several weeks. See Freshworks Stock Price Data. That is inconsistent with Sundaram's proposed drift theory. See Grenadier Reply Rpt. (dkt. 126-2) ¶¶ 25–27.

9

well before the Freshworks stock price dropped below $36 per share—the point at which any losses became recoverable under section 11. Defendants' failure to disaggregate causation before that date (November 15, 2021) does not preclude summary judgment.

### 3. Affirmative Proof of Causation

Sundaram's final response to negative causation is that Defendants needed to, but did not, affirmatively identify the actual cause of the decline in value of Freshworks stock from November 15, 2021 onward. But Sundaram does not identify any legal authority for this proposition. Rather, he cites the following language:

> At trial, [Defendants] will be required to prove the plaintiffs' alleged losses were caused by a factor or factors other than the market's adverse reaction to the revelation of a risk they allegedly concealed. Since [Defendants] will bear the burden of persuasion at trial, they are entitled to summary judgment … only if a rational jury would be compelled to find the plaintiffs' alleged losses were caused by a factor or factors other than the market's adverse reaction to the revelation of a risk they allegedly concealed.

In re Metro. Sec. Litig., No. CV-04-25-FVS, 2010 WL 300402, at *5 (E.D. Wash. Jan. 20, 2010). Yet that language does not mean what Sundaram suggests. It instead means exactly what the statute says—that a securities defendant may establish negative causation by showing that a decline was caused by something "other than" an alleged misstatement or omission. 15 U.S.C. § 77k(e). Nowhere in the statute or the case law is there a requirement that the defendant affirmatively prove what caused the decline; all a defendant must show is that the decline was not caused by the alleged misstatement or omission. See, e.g., Alpha Cap. Anstalt, 2021 WL 2896040, at *4, 7 (negative causation established where event study demonstrated that price fluctuations within a given time were "not statistically significant" and "within the normal range of volatility"); cf. In re Velti PLC Sec. Litig., No. 13-cv-3889-WHO, 2015 WL 5736589, at *28 (N.D. Cal. Oct. 1, 2015) (collecting cases on negative causation). Defendants have met their burden to show that any recoverable loss was not caused by their alleged omissions; they do not need to do more and ascertain the actual cause. Any dispute of fact as to what caused Freshworks stock to decline in value from November 15, 2021 onward is not material, as Sundaram

has not offered evidence to dispute Dr. Grenadier's conclusion that such decline was not caused by Defendants' alleged omissions.

## IV. CONCLUSION

Defendants have established that no recoverable losses (that is, no losses below the $36 per share threshold) were caused by their alleged omissions. And Plaintiffs have not identified any genuine dispute of material fact as to whether the alleged omissions actually caused any recoverable loss. Summary judgment is therefore proper.

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: April 10, 2025

CHARLES R. BREYER
United States District Judge